**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| LATOSHA BROWN; CANDACE FOWLER; JENNIFER IDE; CHALIS MONTGOMERY; KATHARINE WILKINSON, | ) | |
| Plaintiffs, | ) | CASE NUMBER |
| v. | ) | |
| BRIAN KEMP, in his official capacity as Secretary of State of the state of Georgia, | ) | |
| Defendant. | ) | |

**Memorandum of Law in Support of**
**Motion for Temporary Restraining Order**

**Table of Contents**

**TABLE OF AUTHORITIES------------------------------------------------------------ III**

**PRELIMINARY STATEMENT ------------------------------------------------------- 1**

**FACTUAL BACKGROUND ---------------------------------------------------------- 2**

**ARGUMENT---------------------------------------------------------------------------- 1**

I. PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS -- 2

A. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THEIR DUE PROCESS CLAIM IN LIGHT OF KEMP'S DEMONSTRATED BIAS. --------------------- 2

B. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THEIR CLAIM THAT DEFENDANT. KEMP'S USE OF GOVERNMENTAL POWER TO TARGET POLITICAL OPPONENTS VIOLATES THE FIRST AMENDMENT. --------------------- 6

C. KEMP'S BIASED ELECTION ADMINISTRATION VIOLATES PLAINTIFFS' RIGHT TO VOTE.------------------------------------------------------------------------------10

II. THE REMAINING FACTORS FOR THE ISSUANCE OF A TRO WEIGH IN PLAINTIFFS' FAVOR. ---------------------------------------------------------------------------------11

**CONCLUSION ---------------------------------------------------------------------------14**

## Table of Authorities

CASES

*Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983) ------------------------------7, 9, 10
*Ass'n of Nat'l Advertisers Inc. v. FTC*, 627 F.2d 1151, 1170 (D.C. Cir. 1979) ----- 2
*Burdick v. Takushi*, 504 U.S. 428 (1992)------------------------------------------------10
*California Democratic Party v. Jones*, 530 U.S. 567, 586 (2000) -------------------- 7
*Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 887-90 (2009) -------- 2, 5, 6
*Crawford v. Marion Cty Elec. Bd.*, 553 U.S. 1818, 204 (2008) ----------------------10
*Elrod v. Burns*, 427 U.S. 347, 373 (1976)------------------------------------------ 6, 7
*Garcia-Mir v. Meese,* 781 F.2d 1450, 1453 (11th Cir. 1986)-------------------------- 1
*Georgia Coalition for the People's Agenda, Inc., v. Kemp*, No. 1:18-CV-04627-ELR (Nov. 2, 2018) ------------------------------------------------------------------- 4
*Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) ----------------------------------------- 2
*Gill v. Whitford*, 138 S. Ct. 1916, 1938 (2018) ----------------------------------------- 9
*In re Murchison*, 349 U.S. 133, 136 (1955) --------------------------------------------- 2
*League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)------------------------------------------------------------------------------12
*Martin v. Kemp*, No. 1:18-CV-4776-LMM, 2018 WL 5276242 (N.D. Ga. Oct. 24, 2018), *appeal filed*, No. 18-14503 (11th Cir. Oct. 29, 2018)----------------------12
*Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)------------------------12
*Reynolds v. Sims*, 377 U.S. 533, 555 (1964) -------------------------------------------10
*Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005)-------- 1
*Tumey v. Ohio*, 273 U.S. 510, 523 (1927)---------------------------------------------- 2
*Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004)------------------------------------------ 6
*Ward v. Monroeville*, 409 U.S. 57 (1972) ---------------------------------------------- 2
*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) -------------------------------------- 10, 13
*Williams v. Rhodes*, 393 U.S. 23, 29 (1968) ------------------------------------------- 6
*Windsor v. United States*, 379 F. App'x 912, 916-17 (11th Cir. 2010)--------------- 1
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ------------------------ 1

OTHER AUTHORITIES

Daniel Strauss, *Top GA Election Official Warns Dems Are Registering 'All These Minority Voters'*, TALKING POINTS MEMO (Sept. 11, 2014)------------------------- 8
Emily Kopp, *Election Law Experts Decry Brian Kemp's Hacking Allegation in Georgia*, ROLL CALL (Nov. 5, 2018, 9:29 AM) --------------------------------------- 1
James Madison, The Federalist No. 10 (1787)------------------------------------------ 2
Jeremy Redmon, *Brian Kemp Under Scrutiny After Announcing Probe of Democrats*, Atlanta Journal-Constitution (Nov. 4, 2018)---------------------------13

Kristina Torres, *Georgia AG Gets 53 Forms in Probe of Voter Registration Group*, THE ATLANTA JOURNAL-CONSTITUTION (Sept. 20, 2017) --------------------------- 8
Mark Niesse, *Lawsuit Challenges 53,000 Stalled Georgia Voter Registrations*, Atlanta Journal-Constitution (Oct. 11, 2018)------------------------------------------ 4
Press Release, Secretary of State, SOS Releases More Details Over Failed Cyberattack (Nov. 4, 2018) ---------------------------------------------------------- 8
Richard Fausset & Alan Blinder, *Brian Kemp's Office, Without Citing Evidence, Investigates Georgia Democrats Over Alleged 'Hack'*, N.Y. Times (Nov. 4, 2018) ------------------------------------------------------------------------ 6, 3, 9
Richard L. Hasen, *Brian Kemp Just Engaged in a Last-Minute Act of Banana-Republic Level Voter Manipulation in Georgia*, SLATE (Nov. 4, 2018, 3:47 PM) 2
Spencer Woodman, *Register Minority Voters in Georgia, Go to Jail*, THE NEW REPUBLIC (May 5, 2015) ------------------------------------------------------------ 7

## Preliminary Statement

Defendant Brian Kemp is a candidate for Governor in the 2018 election. As might be expected, he is aggressively pursuing the office he seeks. Defendant Kemp is also the Secretary of State of Georgia, charged with administering the election, tallying the results, and declaring the winner. In light of this obvious potential for conflict, many of Defendant Kemp's predecessors as Secretary of State who have run for office have resigned or recused themselves from their election administration duties. That ensures the avoidance of any actual or perceived bias that might undermine the effectiveness of the election. Those Secretaries of State before Defendant Kemp who have not recused themselves have gone out of their way to avoid appearing to use their official powers to benefit their campaigns.

But not Defendant Kemp. To the contrary, Defendant Kemp has sought to use the powers of his office to obtain every possible personal and partisan advantage, culminating the weekend before the general election in what prominent election law scholars have described as "an appalling abuse of power" and "perhaps the most outrageous example of election administration partisanship in the modern era."[1]

---

[1] Emily Kopp, *Election Law Experts Decry Brian Kemp's Hacking Allegation in Georgia*, ROLL CALL (Nov. 5, 2018, 9:29 AM), http://www.rollcall.com/news/politics/election-law-experts-decry-brian-kemps-

Plaintiffs are registered Georgia voters who have voted for (or plan to vote) for Mr. Kemp's opponent in the 2018 general election. Because Defendant Kemp has already demonstrated extreme actual bias in the performance of his official duties, allowing him to determine the winners of Georgia's 2018 general election would violate Plaintiffs' federal constitutional rights to an unbiased decisionmaker, to political association, and to have their votes counted equally and accurately. These injuries are acute and will be irreparable if Defendant Kemp is allowed to determine the outcome of the election, including with respect to any recounts or runoffs. Accordingly, and for the reasons set forth below, Plaintiffs ask this Court for a narrow temporary restraining order (TRO) transferring his duties to another official to be selected by the Governor.

## Factual Background

The Secretary of State's office has substantial responsibilities for administering fair elections in the state. Among other things, the office is responsible for certification of election results; certifying the qualification of candidates and preparation of ballots and election forms; investigating election fraud; and enforcing state election laws; tabulating, computing, and canvassing the

---

hacking-allegation-georgia; Richard L. Hasen, *Brian Kemp Just Engaged in a Last-Minute Act of Banana-Republic Level Voter Manipulation in Georgia*, SLATE (Nov. 4, 2018, 3:47 PM), https://slate.com/news-and-politics/2018/11/georgia-governor-candidate-brian-kemp-attempts-last-minute-banana-republic-style-voter-manipulation.html.

votes cast for all candidates; and declaring who has won a particular election. Compl. ¶ 14-15. The Secretary of State, under Georgia law, also determines when to order a recount in close elections. *Id*. ¶ 15. Defendant Kemp, by nature of his official role, also serves as Chairman of the State Board of Elections. The Board's duties include: "To investigate, or authorize the Secretary of State to investigate, when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution." *Id*. ¶ 16.

In light of those duties, any Secretary of State running for office faces the potential for actual or apparent conflicts of interests, and for that reason, many of Defendant Kemp's predecessors have resigned or taken steps to insulate themselves from such conflicts when running for office. Since he commenced his campaign for governor, however, Defendant Kemp has exercised those duties with respect to an intensely contested race in which he is a candidate. *See id.* ¶ 18. And indeed, in several instances he has taken overt steps to use the official power of his office to advance his electoral interests.

Perhaps most starkly, in the last several days Defendant Kemp responded to a credible report of significant vulnerability in the state's voter registration system

by purporting to launch a transparently unfounded "investigation" against the Democratic Party of Georgia. For years, election security experts have warned about the vulnerability of Georgia's election systems to cyber intrusion, but Defendant Kemp has failed to take action to protect the system. *Id*. ¶ 20. Two years ago, Kemp turned down an offer from the U.S. Department of Homeland Security to provide election cybersecurity assistance before the 2016 election. *Id.* Despite repeated requests from election experts, Defendant Kemp has failed to take measures to strengthen the state's election machinery. *Id.* In August 2018, Defendant Kemp faced a federal lawsuit alleging that he had failed to adequately secure Georgia's voting system, exposing the voting records of over six million Georgia residents. *Id.*

On Saturday, November 3, an election security attorney notified the FBI and counsel for Mr. Kemp that he had learned from a private citizen of a major flaw in the database used to check in voters at the polls. *Id*. ¶ 21. According to independent computer scientists, that flaw could enable anyone with access to an individual voter's personal information to use Georgia's My Voter registration portal to alter or delete a voter's record. *Id*. Rather than address the substance of the concern, Defendant Kemp falsely and without evidence accused his opponent of cyber crimes. *Id*. ¶ 22.

Immediately following these notifications about significant security flaws on the voter registration system that Defendant Kemp is responsible for maintaining, he issued a series of statements through official channels of the Secretary of State's office accusing the Democratic Party of Georgia of criminal behavior. On Sunday, November 4, Defendant Kemp caused the first of two statements to be posted on the official Secretary of State website. It claimed:

> After a failed attempt to hack the state's voter registration system, the Secretary of State's office opened an investigation into the Democratic Party of Georgia on the evening of Saturday, November 3, 2018. Federal partners, including the Department of Homeland Security and Federal Bureau of Investigation, were immediately alerted. "While we cannot comment on the specifics of an ongoing investigation, I can confirm that the Democratic Party of Georgia is under investigation for possible cyber crimes," said Candice Broce, Press Secretary. "We can also confirm that no personal data was breached and our system remains secure."

Later that day, Defendant caused a second statement to be posted on the official Secretary of State website. It stated:

> We opened an investigation into the Democratic Party of Georgia after receiving information from our legal team about failed efforts to breach the online voter registration system and My Voter Page. We are working with our private sector vendors and investigators to review data logs. We have contacted our federal partners and formally requested the Federal Bureau of Investigation to investigate these possible cyber crimes. The Secretary of State's office will release more information as it becomes available.

*Id*. ¶¶ 23-24.[2] The official Secretary of State website where these statements were posted is the same website that Georgia voters use to check polling locations, verify their voter registration status, and learn other key election information. *Id*. ¶ 25.

Upon information and belief, there is not and never was any basis for Defendant Kemp to accuse the Democratic Party of Georgia of seeking to hack into the state's election systems. The public record suggests exactly the opposite—when a voter protection official for the Democratic Party learned of these vulnerabilities, she promptly informed election security experts. *See* Jordan Wilkie & Timothy Pratt, *Kemp's Aggressive Gambit to Distract from Election Security Crisis*, Who What Why (Nov. 4, 2018).[3]

Nonetheless, Defendant Kemp used the resources of his office and the official Secretary of State website to make these accusations to deflect blame for

---

[2] Defendant Kemp's official statements at Secretary of State were only slightly less inflammatory than those issued by his campaign. For example, after claiming that "the systems and protocols established by Secretary of State Brian Kemp" prevented "personal information" from being "breached," his spokesperson went on to state "[t]hese power-hungry radicals should be held accountable for their criminal behavior." Richard Fausset & Alan Blinder, *Brian Kemp's Office, Without Citing Evidence, Investigates Georgia Democrats Over Alleged 'Hack'*, N.Y. Times (Nov. 4, 2018), https://www.nytimes.com/2018/11/04/us/politics/georgia-elections-kemp-voters-hack.html.

[3] *Available online at* https://whowhatwhy.org/2018/11/04/kemps-aggressive-gambit-to-distract-from-election-security-crisis/.

his own failures to address flaws in the election system and to falsely harm his opponents.

This was not the first time Defendant Kemp has sought to use his office for partisan advantage. For example, Kemp has used his office to lead or direct voter purges that removed more than a million names from the state's voter rolls between 2012 and 2016, and some 670,000 last year. *Id*. ¶ 31. One study found that 107,000 of those voters were purged due to a controversial "use it or lose it" practice. *Id.* As another example, Kemp's office held up 53,000 voter registrations—a whopping 70 percent of them from black applicants—because they did not clear an "exact match" process he implemented. *Id.* ¶ 32.

Defendant Kemp's aggressive use of his office to limit voting have faced recent scrutiny from the courts. Two weeks ago, a federal judge ordered Defendant Kemp to instruct election officials to stop summarily discarding absentee ballots that contained signature discrepancies. *Id*. ¶ 33. And as recently as Friday, a federal judge struck down a restrictive "exact match" law instituted by Defendant Kemp. *Id.* The law had jeopardized the ability of over 3,000 newly naturalized citizens to vote in the election. *Id.*

## Argument

Plaintiffs seek a Temporary Restraining Order ("TRO") pursuant to Fed. R. Civ. P. 65(b) that will prevent Defendant Kemp from certifying the results of Georgia's 2018 election or otherwise participating in the tabulation of votes in his own gubernatorial race.

A TRO is warranted if the movant demonstrates (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Windsor v. United States*, 379 F. App'x 912, 916-17 (11th Cir. 2010) (standard for obtaining TRO is identical to that for a preliminary injunction). "The purpose of a temporary restraining order, like a preliminary injunction, is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005). To that end, a "substantial likelihood of success on the merits" requires "only *likely* or *probable*, rather than *certain*, success." *Id.* at 1232. And when the balance of the equities weighs heavily in favor of granting preliminary relief, the movant need only show a "substantial case on the merits" in order to obtain an injunction. *Garcia-Mir v. Meese,* 781 F.2d 1450, 1453 (11th Cir. 1986).

## I. Plaintiffs have a substantial likelihood of success on the merits

### A. Plaintiffs are substantially likely to prevail on their Due Process claim in light of Kemp's demonstrated bias.

It is axiomatic that "no man can be a judge in his own case." *In re Murchison*, 349 U.S. 133, 136 (1955). As the Founders recognized, if an official were to do so, "his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." James Madison, The Federalist No. 10 (1787).[4] While the question of impermissible bias arises most often in the context of judicial proceedings, *see, e.g.*, *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 887-90 (2009), the prohibition extends to other government officials engaged in both adjudicatory and rule-making procedures, *see Gibson v. Berryhill*, 411 U.S. 564, 579 (1973); *Ass'n of Nat'l Advertisers Inc. v. FTC*, 627 F.2d 1151, 1170 (D.C. Cir. 1979). Unconstitutional bias, or the risk of bias, may be pecuniary, *see Tumey v. Ohio*, 273 U.S. 510, 523 (1927), or political, *see Ward v. Monroeville*, 409 U.S. 57, 60 (1972). Both violate due process. A constitutional violation may occur even without proof of "actual bias," but where actual bias has been shown, there is "no doubt" that it warrants relief. *Caperton*, 556 U.S. at 883.

---

[4] Available online at http://avalon.law.yale.edu/18th_century/fed10.asp.

Defendant Kemp has violated the Constitution under either standard: the cumulative effect of his actions amount to a showing of "actual bias," and without question demonstrate the kind of "risk" of bias deemed by the Supreme Court to violate due process. While serving as Secretary of State while running for office need not automatically violate due process, it does present an inherent risk of bias. As noted above, Defendant Kemp is in charge of administering voter registration, setting election procedures, and, ultimately, certifying the election results. Because these powers pose an inherent potential for conflict, election administration officials who are also candidates for office generally go out of their way to avoid exercising their official duties in a biased manner. Defendant Kemp has done the opposite. His recent official conduct amply demonstrates that he is acting with a degree of bias that violates the Constitution.

Most significantly, just three days before Election Day, Kemp's office announced an "investigation" into the state Democratic Party for allegedly hacking into the voter registration system, and he prominently displayed that accusation on his official webpage. *See* Compl. ¶ 23-25; Richard Fausset and Alan Blinder, *Brian Kemp's Office, Without Citing Evidence, Investigates Georgia Democrats Over Alleged 'Hack'*, N.Y. Times (Nov. 4, 2018). In light of all of the public information about the vulnerability and how it came to light – after being affirmatively reported by a private citizen so that it could be patched, and after

repeated efforts to alert Defendant Kemp's office and law enforcement about the vulnerabilities, ¶¶ 20-21—it is simply untenable that the immediate accusation that political rivals violated the law, broadcast via a vital official resource, was a legitimate exercise of the Secretary's power. His decision to post the announcement on the homepage of the official website, a location he knew would attract tremendous traffic from voters in the days preceding the election, constitutes strong objective evidence of actual bias. Standing alone, it would likely be enough to demonstrate a constitutional violation.

Defendant Kemp's other recent actions reinforce the conclusion that his use of official power for unfounded partisan accusations reflects bias in the exercise of his authority. For example, Defendant Kemp has also held up more than 50,000 voter registrations, the majority of which came from minority voters, under the state's "exact match" policy. *See id*. ¶ 33; Mark Niesse, *Lawsuit Challenges 53,000 Stalled Georgia Voter Registrations*, Atlanta Journal-Constitution (Oct. 11, 2018). Judge Ross recently issued an injunction limiting Kemp's implementation of "exact match" for unduly burdening Georgia voters' fundamental right to vote. *See* Order at 33-34, *Georgia Coalition for the People's Agenda, Inc., v. Kemp*, No. 1:18-CV-04727-ELR (Nov. 2, 2018). Taken together, these and other actions show Kemp's willingness to use his official powers in the service of his political self-interest, in violation of the Due Process Clause.

Of course, Plaintiffs need not definitively prove that Kemp is actually biased in his own favor in order to prevail in this litigation. As long as there is an objective *risk* that he is biased, he should not be permitted to participate in judging outcomes in his own election. See *Caperton*, 556 U.S. at 886. Recusal is required whenever, "under a realistic appraisal of psychological tendencies and human weakness," the decision-maker's interest in the proceedings "poses such a risk of actual bias or prejudgment" that it jeopardizes due process. *Id.* at 883-84 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

*Caperton* is instructive. In that case, the Court considered whether an elected justice could, consistent with due process, participate in a lawsuit involving his principal political patron. Without determining that the judge in the case actually harbored bias in favor of his patron, the Supreme Court concluded that the patron's "significant and disproportionate influence—coupled with the temporal relationship between the election and the pending case" created a "probability of actual bias [that] rises to an unconstitutional level." *Id.* at 886-87.

*Caperton* made abundantly clear that, while there may be close cases, a due process violation occurs where the objective risk of bias is "extreme." *Id.* This case meets that standard: Kemp is Georgia's chief election officials, yet his track record demonstrates a history of using that office for partisan gain as he runs for governor. Even if he *might* nonetheless fairly administer the certification of this election (and

that is doubtful), there is an objective risk that his judgment will be biased — perhaps without his even realizing it. *See id.* at 883. Plaintiffs are therefore likely to succeed on the merits of their claim that the Due Process Clause prohibits Defendant Kemp from continuing to administer Georgia's 2018 elections.

### B. Plaintiffs are Substantially Likely to Prevail on Their Claim That Defendant. Kemp's Use of Governmental Power to Target Political Opponents Violates the First Amendment.

Plaintiffs are also likely to prevail on their claim that Mr. Kemp's repeated use of his office to advance his own political fortunes and attack his opponents violates Plaintiffs' freedom of association under the First Amendment. State authority to regulate elections is "always subject to the limitation that [it] may not be exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29 (1968). "First Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring). The Supreme Court's election law precedent repeatedly emphasizes that subjecting voters to disfavored treatment because of their political views or associations violates the First Amendment. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that firing of government employees on the basis of their political beliefs impermissibly violates the First Amendment); *California Democratic Party v. Jones*, 530 U.S.

567, 586 (2000) (holding California's blanket primary system impermissibly burdens freedom of association); *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983) (holding state's filing requirements impermissibly burden First Amendment rights where those requirements "fall[] unequally" on some candidates). And in election law, as in other contexts, "a significant impairment of First Amendment rights must survive exacting scrutiny." *Elrod*, 427 U.S. at 362.

Mr. Kemp has already abused the powers of his office to subject his political opponents and their supporters (including Plaintiffs) to disfavored treatment in their First Amendment rights. By falsely and recklessly accusing his opponents of unlawful activity and threatening them with official investigation, he has already impaired their First Amendment rights. His unfounded claim that the Democratic Party of Georgia attempted to hack the election is only the most recent in his consistent history of using official power to engage in discriminatory partisan actions that disfavor Democratic voters.[5] By repeatedly investigating political

---

[5] Kemp first targeted twelve activists for black candidates in a school board election—including three who won seats on the board—with claims of "voter fraud." Spencer Woodman, *Register Minority Voters in Georgia, Go to Jail*, THE NEW REPUBLIC (May 5, 2015), https://newrepublic.com/article/121715/georgia-secretary-state-hammers-minority-voter-registration-efforts. The resulting felony trials dragged on through a series of acquittals until all remaining charges were dropped in 2014. *Id.* Next, he launched a multi-year investigation into the Asian American Legal Advocacy Center (AALAC) after it inquired why voter registrations it submitted had not been processed. *Id.* Two-and-a-half years later, the investigation ended "with no finding of violations"—but not before leaving an AALAC member "shocked [and] scared." *Id.* And then he announced a criminal

opponents—and often referring them for meritless criminal prosecutions—he has discouraged their ability to associate and engage in protected First Amendment political activity.

His most recent misuse of his office for partisan advantage is especially stark. Georgians often must access the Secretary of State website when voting. *See* Compl. ¶ 26. On that site just days ago, Mr. Kemp alleged that his *legal team* somehow caught the Democratic Party of Georgia attempting to breach the electronic voter registration system. *See id.* ¶¶24-25; Press Release, Secretary of State, SOS Releases More Details Over Failed Cyberattack (Nov. 4, 2018).[6] That terse, four-sentence statement is utterly devoid of supporting evidence. *Id.* This stunning accusation runs entirely counter to the typical pattern of cyber-security

---

investigation into the New Georgia Project (NGP) after it worked to register over 100,000 mostly minority voters. *Id.* He started that investigation only two months after warning a group of Republicans, "[Y]ou know the Democrats are working hard, . . . you know, registering all these minority voters that are out there and others that are sitting on the sidelines, if they can do that, they can win these elections in November." Daniel Strauss, *Top GA Election Official Warns Dems Are Registering 'All These Minority Voters'*, TALKING POINTS MEMO (Sept. 11, 2014), https://talkingpointsmemo.com/livewire/brian-kemp-democrats-minority-voters-republicans. After three years of investigation, his office found no wrongdoing by the group; indeed, it could only identify fifty-three suspicious voter applications of the *nearly 85,000* it reviewed. Kristina Torres, *Georgia AG Gets 53 Forms in Probe of Voter Registration Group*, THE ATLANTA JOURNAL-CONSTITUTION (Sept. 20, 2017), https://politics.myajc.com/news/state--regional-govt--politics/georgia-gets-forms-probe-voter-registration-group/MhhTWfqOh3cdkdoTVmwiYI/.

[6] Available online at http://sos.ga.gov/index.php/general/sos_releases_more_details_over_failed_cyberattack_officially_requests_fbi_to_investigate.

investigations: assessing the extent and nature of a security breach, and then working to identify who committed it. *See* Richard Fausset & Alan Blinder, *Brian Kemp's Office, Without Citing Evidence, Investigates Georgia Democrats Over Alleged 'Hack'*, N.Y. TIMES (Nov. 4, 2018).

By using an official state website to allege malfeasance by the Democratic Party of Georgia, he has chilled potential Democratic voters and created a "burden imposed on [their] associational rights," *Anderson*, 460 at 791 n.12. His actions likely cause plaintiffs to "face difficulties fundraising, registering voters, attracting volunteers, [and] generating support from independents." *Gill v. Whitford*, 138 S. Ct. 1916, 1938 (2018) (Kagan, J., concurring). The burdens Mr. Kemp has placed on Plaintiffs' First Amendment freedom of political association, imposed *on the basis of those associations*, cannot survive strict scrutiny. They have no compelling justification—indeed, the only possible justification is to advantage Mr. Kemp's campaign and harm his political opponents. Reckless official pronouncements such as these must be seen for what they are: blatant attempts to use the cudgel of state power to suppress voters' freedom of association. These violate the First Amendment, and Plaintiffs have a substantial likelihood of prevailing on their First Amendment claim.

### C. Kemp's Biased Election Administration Violates Plaintiffs' Right to Vote.

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Claims asserting violation of the right to vote are evaluated under the two-part test articulated in *Anderson*, 470 U.S. 789, and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Crawford v. Marion Cty Elec. Bd.*, 553 U.S. 1818, 204 (2008) ("To evaluate a law respecting the right to vote – whether it concerns voter qualifications, candidate selection, or the voting process – we use the approach set out in *Burdick*.") (Scalia, J., concurring). In *Burdick*, the Supreme Court held that where the right to vote is "subjected to 'severe' restrictions" by state regulation, in order to survive, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" 504 U.S. at 432 (quoting *Norman v. Reed,* 502 U.S. 279 (1992)).

Here Defendant has severely burdened Plaintiffs' rights to vote – and to have their votes counted fairly and accurately – by subjecting them to an election system that is infected with partisan bias. Defendant has systematically signaled

that he will use the official machinery of his office to diminish the effective participation of the party he opposes. Operating in this context, Plaintiffs face a severe burden: even if they manage to navigate the obstacles erected by Defendant, their voting power is diluted by his systematic efforts to suppress the effective participation of Democrats and their supporters. It is hard to fathom what compelling state interests are supported by his decision to use the Secretary of State website as a vehicle of partisan attack, rather than taking meaningful steps to assess the security in the state's voter registration system and ameliorate any vulnerabilities.

## II. The remaining factors for the issuance of a TRO weigh in Plaintiffs' favor.

The remaining requirements for a TRO are all satisfied here and weigh heavily in favor of granting preliminary relief.

***Irreparable injury***. Kemp's participation in the tabulation and certification of Georgia's election results violates Plaintiffs' constitutional rights to a fair administration of the election in which they have voted; to the right to association protected by the First Amendment; and to have their votes counted in a fair procedure. These are concrete and substantial injuries. And once suffered they cannot be undone. If Mr. Kemp is allowed to certify the election results and declare winners, it will be too late for any redress of Plaintiffs' constitutional

injuries. Once election results are certified, the law provides no opportunity for the results to be re-adjudicated. *See Martin v. Kemp*, No. 1:18-CV-4776-LMM, 2018 WL 5276242 (N.D. Ga. Oct. 24, 2018), *appeal filed*, No. 18-14503 (11th Cir. Oct. 29, 2018); *see also League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote therefore constitutes irreparable injury."). Monetary damages cannot compensate for the loss of the right to vote or to participate in a fairly administered election.

***The balance of equities.*** The balance of hardships likewise favors Plaintiffs. Defendant is not meaningfully harmed by the issuance of the proposed injunction—and the injunction would be of substantial benefit to the public interest. As to Mr. Kemp, he has no lawful right to exercise his official election administration duties in a biased and partisan manner as he has done. Enjoining him from the exercise of those duties for the limited purposes of the 2018 general election would prevent him from continuing to abuse his office for partisan and political gain, but that is not a cognizable legal interest.

And the public interest would benefit substantially by the issuance of the requested TRO.

Defendant's actions to date have cast doubt on his ability to fairly oversee Georgia's elections. *See, e.g.*, Jeremy Redmon, *Brian Kemp Under Scrutiny After Announcing Probe of Democrats*, Atlanta Journal-Constitution (Nov. 4, 2018). Freezing his participation in the tabulation of votes until this Court has a chance to evaluate the constitutionality of his double role as candidate and election overseer will bolster voters' confidence in the integrity of their elections. Furthermore, ensuring all voters' First Amendment and voting rights is itself in the public interest. *See Wesberry*, 376 U.S. at 17 ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."). Restraining Kemp's participation in the vote tabulation process need not delay the certification of the election results. Counties may not begin counting their provisional ballots until Friday, November 9; based on past elections, they will not certify their county-level results until Monday, November 12. This Court can move swiftly during that period to begin to resolve Plaintiffs' claims about the constitutionality of Defendant's role in the vote-tabulation and certification procedures.

## **Conclusion**

The Constitution protects Plaintiffs' right to participate in an election untainted by Defendant's self-interest or partisan bias. For the reasons stated above, this Court should enter a temporary restraining order entering the relief detailed in Plaintiffs' accompanying motion for a TRO and proposed order.

Respectfully submitted,

Date: November 6, 2018

*<u>/s/ Michael J. Moore</u>*

MICHAEL J. MOORE
Georgia Bar No. 520109
CHARLES W. BYRD
Georgia Bar No. 100850
CAROLINE G. MCGLAMRY
Georgia Bar No. 230832
WADE H. TOMLINSON III
Georgia Bar No. 714605
POPE, MCGLAMRY, KILPATRICK, MORRISON & NORWOOD, P.C.
3391 Peachtree Road, NE, Suite 300
P.O. Box 191625 (31119-1625)
Atlanta, GA 30326
Telephone: (404) 523-7706
efile@pmkm.com

BRYAN L. SELLS
Georgia Bar No. 635562
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
bryan@bryansellslaw.com

LAURENCE M. SCHWARTZTOL*
JUSTIN FLORENCE*
Protect Democracy Project, Inc.
10 Ware Street
Cambridge, Massachusetts 02138
Telephone: (202) 945-2092
Facsimile: (929) 777-8248
larry.schwarztol@protectdemocracy.org

IAN BASSIN*
Protect Democracy Project, Inc.
222 Broadway Avenue, #1898
New York, NY 10038
Telephone: (202) 599-0466
Facsimile: (929) 777-8428
ian.bassin@protectdemocracy.org

JESSICA MARSDEN*
Protect Democracy Project, Inc.
106 S. Greensboro St, Suite E
Carrboro, North Carolina 27510
Telephone: (202) 672-4812
Facsimile: (929) 777-8428
jess.marsden@protectdemocracy.org

**Pro Hac Vice* forthcoming

*Counsel for Plaintiffs*